**NOT FOR PUBLICATION**

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

|  |  |  |
|---|---|---|
| IN RE LAWRENCE S. COVEN, et al., | : : : : | Bankruptcy No. 04-24703 (RTL) Adv. Proc. No. 04-2512 (RTL) |
| Debtors. | : : | |
| FIRST AMERICAN TITLE INSURANCE COMPANY, et al., | : : : | |
| Appellants, | : : | CIVIL ACTION NO. 06-4323 (MLC) |
| v. | : : | **MEMORANDUM OPINION** |
| LAWRENCE S. COVEN, et al., | : : | |
| Appellees. | : : | |

Janet B. Coven ("Janet") and her husband, Lawrence S. Coven ("Lawrence", and together with Janet, the "Covens"), jointly filed a voluntary bankruptcy petition under chapter 7 of the United States Bankruptcy Code, 11 U.S.C. § ("Section") 101, et seq. ("Bankruptcy Code"), on April 29, 2004. (Bankr. No. 04-24703, dkt. entry no. 1, Pet.)  First American Title Insurance Company ("First American") and Couch Braunsdorf Title Agency ("Couch Braunsdorf", and together with First American, "Appellants") brought an adversary proceeding against the Covens seeking a judgment, inter alia, (1) declaring that the Covens' debts arising from Appellants' cross claims for contribution and indemnification in a separate adversary proceeding are nondischargeable under Sections 523(a)(2)(A), 523(a)(4), and

523(a)(6), (2) declaring that the Covens' debt arising from First American's subrogation claim is nondischargeable under Sections 523(a)(4) and 523(a)(6), and (3) denying the Covens a discharge pursuant to Sections 727(a)(2) and 727(a)(5). (Bankr. Adv. Proc. 04-2512, dkt. entry no. 14, Am. Compl.)

The Bankruptcy Court entered an order in a separate adversary proceeding denying Lawrence a discharge. (Appellant Br., at 4.) Thus, Appellants determined that it was not necessary for them to proceed against Lawrence in their adversary proceeding. (Id.) The Bankruptcy Court held a several day hearing in early April 2006 on Appellants' remaining claims against Janet. (Id.) During the hearing, Appellants voluntarily dismissed their nondischargeability claims under Sections 523(a)(2)(A), 523(a)(4), and 523(a)(6). (See id.; Appellee App., at CA784.) Thereafter, the Bankruptcy Court entered an Order for Judgment on August 18, 2006 ("8-18-06 Order") finding "no cause of action" against Janet under Sections 727(a)(2) and 727(a)(5) and granting Janet a discharge pursuant to Section 727(a). (Bankr. Adv. Proc. 04-2512, dkt. entry no. 50, 8-18-06 Ord.) Appellants now appeal from the 8-18-06 Order. For the reasons stated herein, the Court will affirm the 8-18-06 Order.

BACKGROUND

## I.   The Commerce Bank Loans

Lawrence obtained a loan from Commerce Bank ("Commerce") in the principal amount of $1,200,000 on August 30, 2000 ("8-30-00

2

Loan"). (Appellant Br., at 5; Appellee Br., at 7.) The 8-30-00 Loan was secured by a mortgage on the Covens' residence. (Appellant Br., at 5; Appellee Br., at 8.) First American, through its agent, Couch Braunsdorf, was to issue title insurance in connection with the loan. (Appellee Br., at 8.) However, that mortgage was not recorded. (Id.; Appellant Br., at 5.) Janet asserts that she did not attend the closing of the 8-30-00 Loan, but authorized Lawrence to sign documents pertaining to the residence on her behalf through a power of attorney. (Appellant Br., at 5; Appellee Br., at 8.)

Lawrence obtained a second loan from Commerce on November 16, 2000 in the principal amount of $770,000 ("11-16-00 Loan"). (Appellant Br., at 5-6.) The 11-16-00 Loan was also secured by a mortgage on the Covens' residence, as well as mortgages on commercial properties located at (1) 314 Route 22 West, Suites B, E, F, and G, Green Brook, New Jersey ("Green Brook Offices"), (2) 429 Central Avenue, New Providence, New Jersey ("New Providence Property"), and (3) 1330 Howe Lane, North Brunswick, New Jersey ("North Brunswick Property"). (Appellant Br., at 5-6; Appellee Br., at 9.) At the closing of the 11-16-00 Loan, Janet learned that Lawrence had incurred credit card debt and other obligations in both of their names without her knowledge. (Appellant Br., at 6-7; Appellee Br., at 10.) Lawrence assured Janet that some of the credit card debt was for expenses related to his legal

3

practice, which would later be reimbursed.  (Appellee Br., at 10;
see Appellant Br., at 7.)

Janet signed a number of documents at the closing of the 11-
16-00 Loan, including the mortgage, Settlement Statement, and
Guaranty of Payment.  (Appellant Br., at 7.)  The mortgage was
recorded against the Covens' residence and the Green Brook
Offices.  (Appellee Br., at 10.)  However, the mortgage was not
recorded against the New Providence Property and possibly the
North Brunswick Property.  (Id.)

## II.  Lawrence's Fraudulent Conduct

### A.   The Fallon Refinancing

Lawrence represented Peter and Patricia Fallon in the
refinancing of the mortgage on their residence in the fall of
2001.  (Appellant Br., at 7.)  Instead of using the funds
obtained from the refinancing to satisfy the existing mortgage on
the Fallons' residence, Lawrence used the funds to pay off
certain obligations of a corporation he solely owned.  (Id.)
Lawrence then concealed his misuse of the refinancing funds by
making payments on the Fallons' original mortgage.  (Id.)
Nevertheless, Peter Fallon later discovered that Lawrence had not
satisfied the existing mortgage with the proceeds of the
refinancing, and required the Covens to secure repayment of that
mortgage by issuing a mortgage on the Covens' residence dated May
24, 2002.  (Id. at 7-8.)  Peter later required the Covens to sign

4

an additional mortgage secured by their residence dated  April 30, 2003, which further ensured repayment of the Fallons' original mortgage.  (Id. at 8.)

### B.    The Costanzo and Diana Refinancings

Lawrence also represented Michael Costanzo, an associate in his law office, and Mark and Susan Diana in mortgage refinancing transactions.  (Id. at 8-9.)  As with the Fallons, Lawrence retained the proceeds of these refinancings instead of satisfying the existing mortgages for Costanzo or the Dianas.  (Id.) Constanzo informed Janet about Lawrence's misuse of his refinancing proceeds in the spring of 2002.  (Id. at 8.)

### C.    Lawrence's Consent to Disbarment

The New Jersey State Bar Association charged Lawrence with ethics violations in January 2002.  (Appellee Br., at 11; Appellee App., at CA244.)  The charges arose from Lawrence's failure to disburse the proceeds of a real estate transaction through an IOLTA client trust account.  (Appellee App., at CA243.)  Lawrence consented to disbarment on advice of counsel in March of 2002.  (Appellee Br., at 11; Appellee App., at CA242.)

## III. The Property Transfers

### A.   The Transfer of the Covens' Residence

The Covens transferred their residence to Lawrence's mother, Maria Coven ("Maria"), on May 1, 2002.[1]  (Appellee Br., at 12; Appellant Br., at 10.)  Lawrence, on behalf of Maria, refinanced the mortgage on the residence with First National Bank of Arizona ("FNBA").  (Appellant Br., at 11; Appellee Br., at 13.)  Specifically, FNBA issued a loan to Maria on April 25, 2003 in the principal amount of $1,050,350, which was secured by a mortgage on the Covens' residence ("4-25-03 Loan").  (Appellant Br., at 11; Appellee Br., at 13.)  In order to obtain the 4-25-03 Loan, Lawrence induced Commerce to issue payoff letters for the 11-16-00 Loan and the arrears on the 8-30-00 Loan by fraudulently representing that Maria was refinancing the mortgage on her own residence and the proceeds of such refinance would be given to Lawrence to pay off the 11-16-00 Loan and bring the 8-30-00 Loan current.  (Appellant Br., at 11; Appellee Br., at 13.)  The Covens used the proceeds of the 4-25-03 Loan to (1) satisfy the remaining balance of the 11-16-00 Loan, (2) bring the 8-30-00 Loan current, and (3) pay a portion of the balance due on the Fallons' original mortgage, which should have been satisfied in

---

[1] The deed transferring the Covens' residence to Maria is dated May 1, 2001.  However, Lawrence testified that the date is a mistake because the deed was actually executed on May 1, 2002. (Appellee Br., at 12; Appellee App., at CA239.)

connection with their refinancing.  (Appellant Br., at 12; Appellee Br., at 13.)  Accordingly, Commerce released its liens on the Covens' residence and the various commercial properties securing the 11-16-00 Loan.  (Appellee Br., at 13.)  After this refinancing, the Covens made no further payments to Commerce. (Appellant Br., at 16.)  Janet did not attend the closing of the 4-25-03 Loan.  (Appellee Br., at 13.)

Lawrence, on behalf of Maria, arranged a subsequent refinancing of the Covens' residence through Greenpoint Mortgage Funding, Inc., and thus, Maria obtained a loan for more than $1,300,000.  (Id. at 14; Appellant Br., at 12-13.)  The proceeds of this refinancing transaction were used to (1) satisfy the FNBA mortgage, and (2) payoff the remaining balance of the Fallons' mortgage.  (Appellants Br., at 12; Appellee Br., at 14.)

**B.   The Transfer of the New Providence Property**

The Covens transferred the New Providence Property in December of 2002 to Maria, in consideration of $1.  (Id. at 11; Appellant Br., at 14.)  In connection with the transfer, Janet signed an Affidavit of Title stating that there were no other liens on the property.  (Appellant Br., at 14.)  The unrecorded Commerce mortgage securing the 11-16-00 Loan was not referenced on the affidavit.  (Id.)  Lawrence arranged for Maria to refinance United Trust Bank's existing mortgage on the New Providence Property dated May 10, 1996 ("1996 Mortgage") with Option One Mortgage Corporation.  (Id.; Appellee Br., at 11-12.)

7

Specifically, Maria obtained a loan for more than $262,000
secured by a mortgage on the New Providence Property.  (Appellant
Br., at 14; Appellee Br., at 12.)   Lawrence did not use the
refinancing proceeds to satisfy the 1996 Mortgage.  (Appellants
Br., at 15; Appellee Br., at 12.)   Instead, Lawrence used the
proceeds to pay off the Dianas' original mortgage, which Lawrence
should have paid off with the proceeds of the Dianas'
refinancing.  (Appellant Br., at 15; see Appellee Br., at 12.)
Janet made subsequent payments on the 1996 Mortgage, but she
claims "she thought she was making payments on account of another
business loan [Lawrence] had taken to finance his law firm
practice."  (Appellee Br., at 12; see Appellant Br., at 15.)

   **C.   The Transfer of the North Brunswick Property and Green
        Brook Offices**

   The Covens transferred the New Brunswick Property to Maria
for the stated consideration of $425,000.  (Appellant Br., at 13;
see Appellee Br., at 14.).  Moreover, Lawrence transferred the
Greenbrook Offices to Maria for the stated consideration of
$250,000.  (Appellant Br., at 13; see Appellee Br., at 14.)
Lawrence arranged for Maria to obtain loans from Bayonne
Community Bank totaling approximately 500,000 to partially
finance the purchase of these two properties.  (Appellant Br., at
13-14; Appellee Br., at 14.)   The loans were secured by mortgages
on the New Brunswick Property and the Greenbrook Offices.
(Appellee Br., at 14.)   The proceeds of the loans were used to

satisfy the remaining balance of the Costanzo mortgage. (Appellant Br., at 13.)   Further, Lawrence received $31,541.53 and Michael Costanzo received $5,882.61.   (Id. at 14.) Maria made no additional payments toward the stated purchase price of these properties.   (Id. at 13.)

## IV.  The Commerce Action

Commerce commenced a foreclosure action with respect to the Covens' residence in the fall of 2003.   (Appellant Br., at 16.) During the foreclosure proceedings, Commerce discovered that (1) the mortgage securing the 8-24-00 Loan was not recorded, (2) title to the Covens' residence had been transferred to Maria, and (3) there were a number of liens on the Covens' residence.   (Id.) Thus, Commerce brought an action against Lawrence, Janet, Maria, and Appellants on February 18, 2004 in the Superior Court of New Jersey ("Commerce Action").   (Id.; Appellee Br., at 14-15.) Maria died in March 2004, and Commerce amended the complaint to add her estate as a defendant.   (Appellant Br., at 16; Appellee Br., at 15.)   Commerce alleged that Appellants had a duty to indemnify it for all losses incurred as a result of the Covens' fraudulent conduct under a Closing Service Letter issued by First American on August 24, 2000 in connection with the 8-24-00 Loan. (Appellant Br., at 17.)   First American filed an answer and cross-claimed for contribution and indemnification against the other defendants.   (Id. at 17; Appellee Br., at 15.)   Appellants

9

entered into a settlement agreement with Commerce pursuant to which Commerce released all claims it had against Appellants in exchange for $275,000.  (Appellant Br., at 17; Appellee Br., at 15.)  Appellants contend that they acquired subrogation rights with respect to the Covens as a result of the settlement. (Appellant Br., at 17.)

## V.   The Bankruptcy Court's August 17, 2006 Opinion

The Bankruptcy Court, after conducting a hearing over the course of several days, concluded that Appellants had not proven their objections to Janet's discharge by a preponderance of the evidence.  (Bankr. Adv. Proc. 04-2512, dkt. entry no. 49, 8-17-06 Mem. Op., at 2.)  The Bankruptcy Court noted that Janet played no part in Lawrence's scheme to hinder, delay, and defraud Commerce. (Id. at 23.)  The court also noted that Janet questioned Lawrence on several occasions, but was always assured that he had everything under control.  (Id. at 24.)  Also, the court accepted Janet's testimony as credible and true, and determined that

> Janet was a victim of Lawrence's duplicity.  He lied or concealed from her the truth about his credit card debt, the reason for his disbarment, his misappropriation of client funds, his failure to satisfy the mortgage on the New Providence Property, his knowledge that Commerce Bank's mortgages were not recorded, and his diversion of funds in every transaction.  He signed her name to mortgages, checks, credit card applications and credit card charges without her knowledge or authorization.

(Id.)

10

The Bankruptcy Court acknowledged that Janet claimed she had no knowledge of Lawrence's fraudulent scheme and that she only executed documents at Lawrence's directions because she believed she was assisting him in satisfying his debts.  (Id. at 25.) Thus, with respect to Appellants' claim that Janet should not receive a discharge pursuant to Section 727(a)(2)(A), the Bankruptcy Court concluded, inter alia, that (1) Janet did not play an active role in the fraud Lawrence perpetrated, (2) "the evidence shows that Janet believed her actions were part of a course of action to realize equity in the properties and be able to refinance and legitimately pay off creditors of Lawrence", (3) more than the existence of a marital relationship must be shown before one spouse will be denied a discharge based on the conduct of the other spouse, and (4) there is no evidence that Janet signed any documents with the intent to either hinder, delay, or defraud any creditor, including Commerce.  (Id. at 28-31.)

The Bankruptcy Court also held, with respect to Appellants' claim that Janet's discharge should be denied under Section 727(a)(5), that Appellants failed to meet their burden of proof under this section.  (Id. at 34.)  Specifically, the court determined that Janet satisfactorily explained that she (1) signed deeds at Lawrence's request while he handled the remainder of the transactions, (2) believed that the Covens were transferring title to their residence and the North Brunswick

11

Property to Maria to gain money to pay off Lawrence's debts, and (3) did not know that there would be equity in the transferred properties or that funds would go unaccounted.  (Id. at 34.) Lastly, the Bankruptcy Court determined that Appellants were not creditors of Janet by virtue of subrogation, contribution, or indemnification rights, and thus, they lacked standing to object to Janet obtaining a discharge.  (Id. 33.)

## DISCUSSION

### I.   Jurisdiction and Standard of Review

A district court has appellate jurisdiction over a bankruptcy court's final judgments, orders, and decrees.  28 U.S.C. § 158(a).  A district court reviews a bankruptcy court's "legal determination de novo, its factual findings for clear error[,] and its exercise of discretion for an abuse thereof." In re Rashid, 210 F.3d 201, 205 (3d Cir. 2000); see Fed.R.Bankr.P. 8013 ("On appeal the district court . . . may affirm, modify, or reverse a bankruptcy judge's judgment, order, or decree or remand with instructions for further proceedings.  Findings of fact, whether based on oral or documentary evidence, shall not be set aside unless clearly erroneous.")  Also, the Court, when addressing mixed questions of law and fact, divides the questions into their respective components and applies the appropriate standard to each.  In re Brown, 951 F.2d 564, 567 (3d Cir. 1991).

12

## II.  Legal Standards[2]

Section 727(a) provides exceptions to the general rule that bankruptcy debtors are entitled to a discharge of their debts. Rosen v. Bezner, 996 F.2d 1527, 1531 (3d Cir. 1993).  The section is construed liberally in favor of the debtor because "[c]ompletely denying a debtor his discharge, as opposed to avoiding a transfer or declining to discharge an individual debt pursuant to § 523, is an extreme step and should not be taken lightly."  Id.; see Wachovia Bank, N.A. v. Spitko (In re Spitko), 357 B.R. 272, 298 (E.D. Pa. 2006) (noting that denial of a debtor's discharge is a harsh sanction).  Nevertheless, if the debtor has been dishonest with the creditors or the Court, denial of discharge is appropriate, notwithstanding that the underlying goal of federal bankruptcy law is to provide the debtor with a fresh start.  In re Spitko, 357 B.R. at 298.

A party objecting to discharge bears the burden of proving those objections by a preponderance of the evidence.  Id.; Pyramid Tech. Corp. v. Cook (In re Cook), 146 B.R. 934, 940 (Bankr. E.D. Pa. 1992); see Grogan v. Garner, 498 U.S. 279, 286-87 (1991) (determining that preponderance of the evidence is the appropriate burden of proof governing the applicability of the

---

[2] The Covens' bankruptcy case was commenced prior to the effective date of the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005.  See 109 P.L. 8, 119 Stat. 23 (2005). Section 727, which is discussed in this Legal Standards section, was amended in that Act.

Bankruptcy Code's nondischargeability provisions).  The Court has discretion in determining whether to grant the debtor a discharge.  <u>In re Cook</u>, 146 B.R. at 940.

## A.    Section 727(a)(2)(A)

Section 727(a)(2)(A) requires the Court to grant a bankruptcy debtor a discharge unless:

> the debtor, with intent to hinder, delay, or defraud a creditor . . . has transferred, removed, destroyed, mutilated, or concealed, or has permitted to be transferred, removed, destroyed, mutilated, or concealed–
>     (A) property of the debtor, within one year before the date of the filing of the petition[.]

11 U.S.C. § 727(a)(2)(A).  Thus, a party seeking to bar a debtor's discharge pursuant to Section 727(a)(2)(A) must show (1) a disposition of property, such as a transfer or concealment, in which the debtor has a direct proprietary interest, (2) the debtor's subjective intent to hinder, delay, or defraud a creditor or the bankruptcy trustee through such disposition, and (3) such disposition and the debtor's subjective intent occurred within the one year period preceding the filing of the bankruptcy petition.  <u>In re Spitko</u>, 357 B.R. at 299; <u>see</u> <u>Rosen</u>, 996 F.2d at 1531 (noting that the party seeking discharge under Section 727(a)(2)(A) must show that during the one year period preceding the filing of the bankruptcy petition, the debtor committed one of the acts listed in that section with the requisite intent).

14

A fraudulent concealment may arise when the debtor transfers property to a third party but retains control or a beneficial interest in such property.  In re Spitko, 357 B.R. at 300; see Rosen, 996 F.2d at 1532 ("In a situation involving a transfer of title coupled with retention of the benefits of ownership, there may, indeed, be a concealment of property.").  Moreover, under the continuous concealment doctrine, the Court may find that a concealment occurred during the one year period preceding the bankruptcy filing "even if the initial act of concealment took place before this one year period as long as the debtor allowed the property to remain concealed into the critical year."  Rosen, 996 F.2d at 1531; In re Spitko, 357 B.R. at 300 (stating that under the continuous concealment doctrine, a debtor is denied a discharge "even if he initially concealed property before the one-year pre-bankruptcy period began where the concealment and requisite intent to defraud continued into that one-year period").

The requisite intent to hinder, delay, or defraud a creditor may be inferred from circumstantial evidence or the debtor's course of conduct.  In re Spitko, 357 B.R. at 301.  Accordingly, the Court may find the requisite intent where the transfer at issue was gratuitous or made to the debtor's relative.  Id.  Moreover, there are certain "badges of fraud", which strongly suggest that the debtor intended to hinder, delay, or defraud a

creditor or the bankruptcy trustee.  <u>Id.</u>  These "badges" include:

> (1) a close relationship between the transferor and the
> transferee; (2) that the transfer was in anticipation
> of a pending suit; (3) that the transferor Debtor was
> insolvent or in poor financial condition at the time;
> (4) that all or substantially all of the Debtor's
> property was transferred; (5) that the transfer so
> completely depleted the Debtor's assets that the
> creditor has been hindered or delayed in recovering any
> part of the judgment; and (6) that the Debtor received
> inadequate consideration for the transfer.

<u>Id.</u>  Thus, a bankruptcy court must consider the totality of the

circumstances in determining whether denial of discharge is

warranted under Section 727(a)(2)(A).  <u>See id.</u>

**B.   Section 727(a)(5)**

Section 727(a)(5) requires the Court to grant the debtor a

discharge, unless the debtor "has failed to explain

satisfactorily . . . any loss of assets or deficiency of assets

to meet the debtor's liabilities." 11 U.S.C. § 727(a)(5).  Under

this section,

> the plaintiff has the initial burden of identifying the
> assets in question by appropriate allegations in the
> complaint and showing that the debtor at one time had the
> assets but they are no longer available for the debtor's
> creditors.  The plaintiff must introduce more than merely
> an allegation that the debtor has failed to explain
> losses, e.g., the objector must produce some evidence of
> the disappearance of substantial assets or of an unusual
> transaction which disposed of assets.   There is no
> requirement, however, that the plaintiff show that the
> debtor acted fraudulently or intentionally.

<u>Riehm v. Park (In re Park)</u>, 272 B.R. 323, 332 (Bankr. D.N.J.

2001) (internal citations and quotations omitted); <u>see In re</u>

<u>Spitko</u>, 357 B.R. at 318 (explaining that the party seeking the

16

discharge denial under Section 727(a)(5) bears the initial burden of proving that the debtor has not adequately explained any loss or deficiency of assets).  This section does not require the plaintiff to show that the debtor acted with any particular state of mind.  <u>See</u> <u>Spencer v. Blanchard</u>, 201 B.R. 108, 120 (Bankr. E.D. Pa. 1996).  Once the plaintiff meets this burden, the burden shifts to the debtor to satisfactorily explain the loss or deficiency.  <u>In re Spitko</u>, 357 B.R. at 318-19; <u>Ehle v. Brien (In re Brien)</u>, 208 B.R. 255, 258 (1st Cir. B.A.P. 1997).

The determination of what constitutes a "satisfactory" explanation is a matter of discretion for the court.  <u>PNC Bank v. Buzzelli (In re Buzzelli)</u>, 246 B.R. 75, 117 (Bankr. W.D. Pa. 2000).  A "satisfactory" explanation is one that convinces the bankruptcy judge.  <u>Chalik v. Moorefield (In re Chalik)</u>, 748 F.2d 616, 619 (11th Cir.1984); <u>In re Cook</u>, 146 B.R. at 941 (stating that the debtor must render some convincing explanation for the loss of assets to preserve the discharge).  "Although the explanation need not be far-reaching and comprehensive, it must consist of more than a 'vague, indefinite, and uncorroborated hodgepodge of financial transactions.'"  <u>In re Spitko</u>, 357 B.R. at 319; <u>see In re Chalik</u>, 748 F.2d at 619 (noting that vague and indefinite explanations unsupported by documentation are unsatisfactory).  Further, "for purposes of a § 727(a)(5) inquiry, the court is not concerned with whether the disposition

17

of the assets was proper under the Bankruptcy Code, but rather only whether the explanation satisfactorily describes what happened to the assets." In re Spitko, 257 B.R. at 319-20. Thus, courts ultimately must focus on the truth, detail, and completeness of the debtor's explanation. Id. at 319; see In re Cook, 146 B.R. at 942 (noting that the court must have "some sense that it is dealing with more than an unreliable remake of reality, custom-made to comport with current exigencies").

### III. Legal Standards Applied Here

#### A.   Appellants' Section 727(a)(2)(A) Objection

Appellants argue that the Bankruptcy Court "disregarded the overt actions of Janet Coven which were key components to [Lawrence's] fraudulent scheme.  Instead the Bankruptcy Court took Janet at her word when she claimed ignorance, despite evidence that she lied as to her knowledge of her husband's actions." (Appellant Br., at 20.)  Appellants note that Janet discovered that Lawrence had incurred obligations without her knowledge at the closing of the 11-16-00 Loan, and later learned in March of 2002 that Lawrence would be surrendering his law license because he fabricated a deposit slip.  (Id. at 24-25.)

Appellants further note that Janet signed the deeds transferring the Covens' residence, the New Brunswick Property, and the New Providence Property to Maria and executed Affidavits of Title in connection with these transfers, which failed to

18

acknowledge Commerce's liens on the properties.  (Id. at 28-30.)
Thus, Appellants contend that "there is no way Janet Coven could
believe that her signing of deeds and affidavits and the writing
of checks were innocent acts, given her past experience with her
husband."  (Id. at 33.)  Appellants further contend that the
Bankruptcy Court erred by failing to (1) consider the "badges of
fraud" in determining whether Janet acted with intent to hinder,
delay, or defraud a creditor, (2) consider the pertinent facts,
(3) hold Janet accountable for Lawrence's actions because she
blindly signed documents at his request and should have known
that he would use them for an inappropriate purpose, and (4) find
that Janet remained intentionally ignorant of Lawrence's actions.
(Id. at 33-34, 36-39.)

        Janet, in contrast, argues that the Bankruptcy Court did not
err in concluding that Appellants failed to establish that she
acted with the intent required by Section 727(a)(2)(A).
(Appellee Br., at 18.)  Janet notes that, although the North
Brunswick property was transferred to Maria within the one year
period preceding the filing of her bankruptcy petition, the
Covens' residence and the New Providence Property were
transferred before this time period.  (Id. at 20.)  Thus, Janet
asserts that the transfer of the residence and the New Providence
Property can only provide a basis for objecting to her discharge
under the continuous concealment doctrine, which requires the

19

debtor to retain a secret interest in the property following transfer.  (Id. at 20-21.)  Janet asserts, however, that (1) "there are no allegations that [she] retained a secret interest in any of the three (3) Properties transferred to Maria", and (2) Appellants have not alleged or presented any evidence indicating that any party concealed the properties Janet transferred to Maria.  (Id. at 21.)

Janet also asserts that the Bankruptcy Court made specific findings regarding the numerous documents entered into evidence, and the credibility of the testimony before concluding that Appellants had not sustained their burden of showing that she signed the deeds transferring the properties to Maria with the intent to defraud creditors.  (Id. at 22.)  Further, Janet asserts that the Bankruptcy Court did consider each of the "badges of fraud" in its opinion.  (Id. at 23.)  Accordingly, Janet contends that "the Bankruptcy Court properly concluded that [Appellants] offered no evidence of an intent on the part of [Janet] to hinder, delay or defraud Commerce Bank."  (Id.)  Finally, Janet contends that the fraudulent intent of one spouse cannot be imputed to the other spouse simply because he or she benefitted from and knew about the spouse's misconduct.  (Id. at 24.)  Therefore, Janet asserts that "there is a glaring absence of any evidence of an improper intent by [her] in making the transfers."  (Id. at 25.)

The Bankruptcy Court, after conducting an evidentiary hearing over the course of several days in early April 2006, entered the 8-18-06 Order finding "no cause of action" under Section 727(a)(2) and 727(a)(5) and granting Janet a discharge. (Bankr. Adv. Proc. 04-2512, dkt. entry no. 50, 8-18-06 Ord.) This Court finds, based on the evidence in the record, that it was not clearly erroneous for the Bankruptcy Court to accept Janet's testimony as credible and conclude that she "has not played an active role in any of the fraud perpetrated by her husband." (Id., dkt. entry no. 49, 8-17-06 Mem. Op., at 28.) At the closing of the 11-16-00 Loan, Janet learned that Lawrence had incurred joint debt without her knowledge. (Appellant Br., at 6-7; Appellee Br., at 10.) However, Janet stated that when she questioned Lawrence about the undisclosed obligations he told her "he always paid it off. And not to worry about it, that you know, the refinance is taking care of everything, don't worry about it." (Dkt. entry no. 10, Appellant App., at A-109.) She also testified that (1) she did not know that she and Lawrence were conveying property to Maria for only $1, but instead believed Maria would obtain a mortgage on the property and pay Commerce, (2) although she made payments on the mortgage on the New Providence Property that should have been satisfied when the property was refinanced, she made such payments at Lawrence's request without knowing what obligation the mortgage secured, (3)

in April 2003, Commerce had stopped calling her, and thus, she believed their mortgage securing the 8-30-00 Loan had been satisfied, (4) when she confronted Lawrence after learning that he had not paid off the Fallon and Costanzo mortgages in connection with their refinancings, he told her, "I had a problem and I will take care of it", and (5) she questioned Lawrence frequently about how he would remedy the defalcations once they were brought to her attention.  (Id. at A-131, A-137, A-144-A-145, A-217, A-221.)

Lawrence testified, inter alia, that he (1) did not discuss the circumstances surrounding his decision to consent to disbarment with Janet, (2) signed Janet's name on the mortgage securing the 8-30-00 Loan, and (3) gave Janet a coupon booklet for a mortgage that should have already been satisfied and instructed her to make the required mortgage payments, but "[s]he didn't understand anything other than I told her those had to be paid."  (Id. at A-16, A-95, A-259.)  Additionally, the Commerce representative who handled Lawrence's loans stated that he spoke with Janet several times about the loan delinquencies, but they "never really had extensive conversations about the payments.  It was more, she was serving as a conduit of information to get the message to [Lawrence]."  (Id. at A-52.)  Thus, this Court finds that the Bankruptcy Court did not err in concluding that the evidence did not establish that Janet signed any documents or

22

transferred any property with the requisite intent to hinder, delay, or defraud a creditor, including Commerce.  (See Bankr. Adv. Proc. 04-2512, dkt. entry no. 49, 8-17-06 Mem. Op.)

The Bankruptcy Court considered the testimony of numerous witnesses as well as the documents submitted into evidence, before concluding, in its discretion, that "Janet believed her actions were part of a course of action to realize equity in the properties and to be able to refinance and legitimately pay off creditors of Lawrence."  (See id. at 29.)  Accordingly, although the "badges of fraud" discussed above suggest that Lawrence acted with the requisite intent, they have no applicability to Janet, who simply executed documents and transferred properties at Lawrence's direction because she was misled into believing that he was extracting equity from such properties to legitimately satisfy obligations.  Similarly, the continuous concealment doctrine is inapplicable here because Appellants have not alleged that Janet concealed any property interest, but instead argue that she transferred property for nominal consideration with the intent to defraud, hinder, or delay Commerce.  See Rosen, 996 F.2d at 1532 (noting that continuous concealment doctrine applies to concealment of a property interest, not concealment of a transfer).  Accordingly, because the Covens transferred their residence in May of 2002 and the New Providence Property in December of 2002, before the one year period preceding the filing

23

of the Covens' bankruptcy petition, these transfers cannot form the basis of a Section 727(a)(2)(A) objection to discharge. <u>See</u> 11 U.S.C. § 727(a)(2)(A).

The Court finds that the Bankruptcy Court did not abuse its discretion in concluding that Lawrence's fraudulent intent should not be imputed to Janet. (<u>See</u> Bankr. Adv. Proc. 04-2512, dkt. entry no. 49, 8-17-06 Mem. Op., at 29-31.) Janet did not have a business relationship with Lawrence. <u>See</u> <u>Agribank, FCB v.</u> <u>Gordon</u>, No. 01-374-4, 2002 U.S. Dist. LEXIS 26436, at *15-*17 (M.D. Ga. Sept. 18, 2002) (listing cases where courts (1) imputed fraudulent intent from an agent to the bankruptcy debtor in business or commercial context, (2) imputed fraudulent intend to a principal who knew or should have known of its agent's fraudulent intent, and (3) refused to impute fraudulent intent from one partner to another).

Janet executed transaction documents and made mortgage payments at Lawrence's direction without having any knowledge that she was participating in his fraudulent scheme. <u>See</u> <u>Allison</u> <u>v. Crescentia (In re Allison)</u>, 960 F.2d 481, 485 (5th Cir. 1992) (noting that "agency theory has been applied to impute the fraudulent acts of one spouse to the other in cases in which the other spouse was involved in a business or scheme" but determining that wife's debts were dischargeable because there was no evidence linking wife to husband's fraudulent acts or plans); <u>Gordon</u>, 2002 U.S. Dist. LEXIS 26436, at *19 (noting that

some courts refuse to impute intent from one spouse to the other
spouse, who had little or no involvement in the wrongdoing, and
stating "most courts make a distinction between spouses who are
involved in a business or partnership and spouses who are not
operating a business, and generally hold that intent will not be
imputed from one spouse to the other in the absence of a business
relationship"); In re Tara of N. Hills, 116 B.R. 455, 462
(E.D.N.C. 1989) (noting that a wife is not the agent of her
husband "simply by force of the marital relationship"); Agribank,
FCB v. Gordon, 293 B.R. 817, 825 (Bankr. M.D. Ga. 2003)
(determining, on remand from district court, that husband's
intent to defraud a creditor could not be imputed to wife who did
not know about the false financial information, and thus, wife's
obligations to the creditor were dischargeable under Section
523); Chios v. Klein (In re Klein), 58 B.R. 397, 398 (Bankr. E.D.
Pa. 1986) (refusing to find certain debts of wife
nondischargeable under Section 523(a)(2)(B) even though she
executed certain material documents because there was no evidence
to impute husband's intent to wife).  Thus, the Bankruptcy Court
did not err in refusing to impute Lawrence's fraudulent intent to
Janet.  Therefore, this Court finds that the Bankruptcy Court did
not abuse its discretion in determining that Janet should not be
denied a discharge under Section 727(a)(2)(A) because Appellants
have not sufficiently demonstrated that she acted with the

25

requisite intent to hinder, delay, or defraud a creditor.  (See
Bankr. Adv. Proc. 04-2512, dkt. entry no. 49, 8-17-06 Mem. Op.,
27-31.)  See In re Cook, 146 B.R. at 940.

**B.   Appellants' Section 727(a)(5) Objection**

Appellants note that Lawrence was denied a discharge because
he failed to explain (1) the excess equity in the properties he
and Janet transferred to Maria, and (2) what he did with the
$31,541,53 proceeds he received from the refinancing of the New
Brunswick Property.  (Appellant Br., at 41.)  Appellants argue
that Janet also not explained the loss of such funds, and thus,
she should be denied a discharge under Section 727(a)(5).  (Id.)
Specifically, Appellants contend that the 8-18-06 Order should be
reversed because:

> The loss of assets is the excess value that should have
> been received when the [New Brunswick] Property was
> transferred to [Maria].  That property was owned by
> Janet Coven as much as it was owned by [Lawrence]
> Coven.  There has been no satisfactory explanation and,
> therefore, a discharge should be denied to Janet Coven
> pursuant to 727(a)(5).

(Id. at 42.)  However, Janet contends that the Bankruptcy Court
correctly concluded that she (1) did not receive any excess loan
proceeds, (2) was a victim of her husband's fraudulent scheme,
and (3) had nothing to do with the disposition of loan proceeds,
and thus, was unaware that certain funds had not been accounted
for.  (Appellee Br., at 32.)

Appellants have produced some evidence of the disappearance
of substantial assets, including the excess equity in the

properties transferred to Maria and the loan proceeds Lawrence received in connection with the New Brunswick Property refinancing.  See In re Park, 272 B.R. at 332.  However, Janet has explained that she simply executed documents at Lawrence's request and allowed him to handle the remainder of the transactions.  Thus, the Bankruptcy Court, in its discretion, determined that Janet's explanation was satisfactory and concluded that Appellants had not met their ultimate burden of proof under Section 727(a)(5).  (See Bankr. Adv. Proc. 04-2512, dkt. entry no. 49, 8-17-06 Mem. Op., at 34.)  See In re Buzzelli, 246 B.R. at 117 (stating that what constitutes a "satisfactory" explanation is a matter of discretion for the court); In re Chalik, 748 F.2d at 619 (stating that a "satisfactory" explanation is one that convinces the bankruptcy judge).  In light of the evidence discussed supra, this Court finds that the Bankruptcy Court did not err in accepting Janet's explanation that she has no knowledge of the excess equity in the transferred properties or the loan proceeds Lawrence received because she too was a victim of Lawrence's fraudulent scheme. (Appellee Br., at 18.)  Accordingly, this Court finds that the Bankruptcy Court did not abuse its discretion in determining that Janet's explanation

was credible, and thus, concluding that she should not be denied a discharge under Section 727(a)(5).[3]

## CONCLUSION

The Court, for the reasons stated supra, concludes that Appellants have failed to demonstrate that the Bankruptcy Court erred in entering the 8-18-06 Order and granting Janet a discharge pursuant to Section 727(a).  The Court will issue an appropriate order.

s/ Mary L. Cooper
**MARY L. COOPER**
United States District Judge

---

[3] The Court notes that Appellants also argue that the Bankruptcy Court erred in concluding that First American was not a creditor of Janet, and thus, did not have standing to object to her discharge.  (Appellant Br., at 42-47; see Bankr. Adv. Proc. 04-2512, dkt. entry no. 49, 8-17-06 Mem. Op., at 31-33.)  See 11 U.S.C. § 727(c)(1) (stating that only the trustee or a "creditor" of the debtor may object to the debtor receiving a discharge under Section 727(a)).  However, because this Court finds that the Bankruptcy Court did not abuse its discretion in determining that Appellants did not meet their burden of proving their objections to Janet's discharge, the Court need not address whether Appellants had standing to commence this denial of discharge action in the first instance.